UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | No. 6:23-CR-19-REW-HAI |
| ) | |
| v. ) | |
| ) | OPINION & ORDER |
| MUFID ELFGEEH, ) | |
| ) | |
| Defendant. ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Defendant Mufid Elfgeeh moves to suppress statements made during two encounters while incarcerated, both allegedly involving unwarned custodial interrogation in violation of *Miranda*. *See* DE 92. The Court referred suppression proceedings to Magistrate Judge Hanly A. Ingram. *See* DE 105. After conducting an evidentiary hearing, Judge Ingram recommended that the Court deny the motion as to both interviews, finding that Elfgeeh was not in custody for purposes of *Miranda* in either setting. *See* DE 161.[1]

Elfgeeh then timely objected to the recommendation as to both interviews. *See* DE 167. The Government did not respond. The Court, on de novo review, agrees with Judge Ingram. The *Howes* factors weigh dispositively against a custodial finding as to both interactions. Accordingly, the Court **OVERRULES** Elfgeeh's objections, DE 167, **ADOPTS** Judge Ingram's report and recommendation, DE 161, and **DENIES** Elfgeeh's suppression motion, DE 92.

---

[1] The record before Judge Ingram included all of the briefing (DEs 92, 95, 100, 103, 149, and 150). The exhibits captured documentation of the interviews (DE 95, 95-1, and 92-1). The transcript of the hearing is at DE 146. This Court has read and considered all of the paper. Assumptions, from the parties and process, include that a) there was interrogation and b) Elfgeeh never got *Miranda* warnings. The crux is whether Elfgeeh was in *custody* during questioning, a challenging issue when the daily milieu for an inmate is, by definition, prison.

1

I.  **Background**

In April 2023, a federal grand jury indicted Defendant Elfgeeh on a charge of attempted murder of his cellmate while incarcerated at USP McCreary. *See* DE 1 (alleging the crime occurred on January 15, 2019). The Court first appointed Scott Hayworth to represent Elfgeeh. *See* DE 10. Amid competency litigation, Elfgeeh expressed dissatisfaction with counsel. *See* DE 22. The Court then replaced Hayworth with Travis Rossman as Elfgeeh's counsel. *See* DE 24. After the Court adjudged Elfgeeh competent to stand trial, *see* DE 67, Elfgeeh again expressed counsel dissatisfaction. *See* DE 90. With that motion pending, Rossman filed the present suppression motion. *See* DE 92. The Court referred the motion to Judge Ingram for further proceedings. *See* DE 105. Thereafter, Rossman filed a formal motion to withdraw as counsel, *see* DE 108, which the Court granted, tapping Patrick Nash as Elfgeeh's third appointed counsel in this case. *See* DE 111; 112.

With Nash now representing Elfgeeh and proceeding with the suppression motion as filed by Rossman, Judge Ingram held an evidentiary hearing. *See* DE 144. Elfgeeh's suppression motion concerns two post-incident interviews conducted during Elfgeeh's incarceration at USP McCreary. Elfgeeh challenges the interviews separately, so the Court considers them separately.

The first interview concerns a January 23, 2019, interview between Elfgeeh and an internal BOP investigator at USP McCreary. At that time, Elfgeeh was and had long been housed in the Special Housing Unit (SHU) of USP McCreary. *See* DE 146 at 28 (noting 13 months straight). Special Investigative Service (SIS) Investigator Josh Duncan conducted the interview. *See* DE 161 at 7. Elfgeeh remembered the event during his testimony. He testified that he was alone in his cell at the time, and he was not handcuffed. *See* DE 146 at 29–30. Duncan stayed outside the cell. *See id.* Elfgeeh reported that similar informal interviews made up a customary and normal part of

prison life. SIS officers would make normal rounds at least once a week in the prison to talk with inmates and would also interview an inmate following any incident report. *See id.* at 26, 31. Elfgeeh reported that the interview was short, lasting an estimated "minute or less" or a "hot minute," but in any event, a "short time." *See id.* at 30, 43–44. Duncan, according to Elfgeeh, did not read or tell him his rights concerning the interview. *See id.* at 30.

Elfgeeh offered conflicting testimony as to whether he believed he could refuse to answer questions. First, Elfgeeh stated that he was required to talk to the SIS officer, *see id.* at 29–30, but later on cross examination and on Judge Ingram's direct inquiry, amended his testimony, stating that "you could just refuse or you could say whatever the reason was," and "when they come to ask you questions at the door, you could refuse to talk to them." *See id.* at 44–46. There was no equivocation in his later depiction of the right to refuse to talk with SIS.

Adding a wrinkle, the interview occurred just a day after Elfgeeh's appearance at a "DHO/shot" hearing concerning the January 15, 2019, altercation (the charge basis) between Elfgeeh and his cellmate. *See* DE 161 at 6. As Judge Ingram explained, "[a] DHO is a disciplinary hearing officer. 'Shot' refers to a prison disciplinary report concerning a prohibited act and, broadly, the ensuing investigatory proceedings." *See id.* Elfgeeh understood that SIS officers, like Duncan, conducted "investigations within the prison," and could refer matters to DHOs for potential sanctions for misconduct. *See* DE 146 at 26–28. SIS did not have sanction power. *Id.*

Judge Ingram consulted the five *Howes* factors, *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012), ultimately finding that the January 23, 2019, cell interview was not custodial under *Miranda*, and thus, did not require warnings to avoid suppression. *See* DE 161 at 9. In Judge Ingram's view, all but one of the five factors weighed in favor of a noncustodial finding. *See id.* Elfgeeh was in his own cell, even if in the SHU; he was not removed to another location or

3

physically restrained outside of normal cell confinement; the interview was short; and although Duncan never explicitly told Elfgeeh that he was free to end the interview, Elfgeeh independently understood that these interviews were voluntary and that he could decline to answer. *See id.* Judge Ingram concluded, with "no difficulty," that Elfgeeh was not in custody for purposes of *Miranda* during the January 23, 2019, cell interview. *See id.*

Judge Ingram then considered the second interview, which occurred on February 1, 2019. FBI Special Agent (SA) Michael McLaughlin, who testified at the hearing, conducted the interview. *See* DE 146 at 51–63. Elfgeeh first testified concerning his recollection of the event. He explained that this interview was initially different from the cell interview due to FBI presence—an unusual (indeed, one-off) occurrence compared to the normal interview with prison staff. *See id.* at 33, 45. Elfgeeh testified that the SHU Lieutenant and two correctional officers removed Elfgeeh from his cell and escorted him to the Lieutenant's office, housed within the SHU, where the questioning occurred. *See id.* at 33. Throughout the entire event—including travel from Elfgeeh's cell, during the interview, and travel back to the cell—Elfgeeh was handcuffed behind his back. *See id.* at 33–34. According to Elfgeeh, SHU inmates are always restrained behind their back for any out-of-SHU activity, save time spent in a separate isolated cage in the recreation area, regardless of the destination or purpose. *See id.* at 45, 49.

When Elfgeeh arrived at the office, in his telling, the officers sat Elfgeeh in a chair across from three SIS officers[2] and SA McLaughlin. *See* DE 146 at 36. The two officers and lieutenant who escorted Elfgeeh to the office closed the door and remained outside. *See id.* at 38. Elfgeeh estimated that the office was about twice the size of his 6x13 SHU cell. *See id.* at 36–37. As Elfgeeh

---

[2] McLaughlin disputed the presence of the three officers in his testimony, stating that only he and Elfgeeh, plus one SIS Tech, remained in the office after the lieutenant and two correctional officers closed the door. *See* DE 146 at 51.

4

sat down, SA McLaughlin began questioning. Elfgeeh was not offered food or water, and he claims that, like the SHU interview, no one read him *Miranda* warnings or explained that the interview was voluntary or that he could terminate and leave. *See id.* at 37–38. However, unlike the SHU interview, Elfgeeh did not feel free, from the outset, to terminate the interview or refuse to answer questions. *See id.* Per Elfgeeh's testimony, he believed that the prison could "terrorize" him or otherwise impose sanctions on him if he did not participate. *See id.* at 47–48. Elfgeeh intimated that guards could retaliate (and had retaliated) against him for refusing to answer questions by denying him recreation time, the ability to shower, and by "playing" with his food. *See id.* at 48. Elfgeeh recalled the interview lasting "not long," estimating five minutes or less. *See id.* at 40. After that period, guards then escorted Elfgeeh, still restrained, back to his SHU cell. *See id.* at 39.

FBI SA McLaughlin also testified at the hearing, painting a partially different picture. McLaughlin confirmed that the interview occurred in the SHU office, but he explained that it was only he and one other SIS officer that joined the interview. *See* DE 146 at 51. His post-interview 302 report confirmed as much. *See id.* at 55; *see also* DE 92-1. McLaughlin also explained that he informed Elfgeeh before questioning that the interview was voluntary and that Elfgeeh could refuse to answer questions and stop speaking at any time. *See id.* at 51–52. He testified that a normal "preamble" began every SHU (numbered between 10 and 50) interview that he conducted, informing the subject that the questioning was voluntary and that the person could stop answering questions at any point. *See id.* at 56. McLaughlin confirmed that the preamble fell short of a full *Miranda* warning. He agreed that Elfgeeh signed no waiver and that the 302 does not record the preamble. *See id.* at 56–57. Though, he explained, he did not normally make any note of the preamble in his reports unless the interview involved a full *Miranda* warning with a signed waiver. *See id.* at 61–62. Nonetheless, it was common practice for McLaughlin to give a warning or notice

5

of voluntariness in the 10–50 SHU interviews he conducted. *See id*. He described his adherence to this practice as "always" occurring, that he "always, as a matter of principle, always let people know that it's a voluntary interview that they're engaging with me." *Id.* at 63.

McLaughlin also described a calm exchange. Elfgeeh sat down at a large desk in a small "closet-type" office across from McLaughlin and SIS Smith. *See* DE 146 at 57–58. All remained seated throughout the interview; there was no coarse language or yelling, and Elfgeeh was, in fact, "very eager" to explain what precipitated the assault. *See id.* at 51–52. According to McLaughlin, SIS informed him that Elfgeeh wanted to address the incident (later phrased as SIS predicting Elfgeeh would willingly talk) and explain why it occurred. *See id.* at 60. The interview lasted about 10 minutes, in McLaughlin's estimation. *See id.*

Judge Ingram began by resolving the factual discrepancies between Elfgeeh's and McLaughlin's testimony. The two points of contention centered around the number of SIS officers in the room during the interview and whether McLaughlin offered some sort of notice of voluntariness to Elfgeeh before questioning him. *See* DE 161 at 14–16.

Judge Ingram credited SA McLaughlin's testimony on both issues. *See id.* He first found that, given the clear notation on McLaughlin's 302 report that he was accompanied by one person, Elfgeeh's recollection compared to documented evidence was less compelling. *See id.* at 14. Defendant's history before the Court, including significant competency proceedings and Elfgeeh's persistent claims of auditory hallucinations, had impact. Judge Ingram then considered the discrepancy in testimony concerning McLaughlin's administration of a preamble confirming Elfgeeh's right to terminate the interview and refuse to answer questions. Judge Ingram first noted that there was good reason not to credit Elfgeeh's testimony as compared to McLaughlin's. He explained: "The Court [] cannot ignore that Elfgeeh has a history of exhibiting disorganized

6

thinking and unusual and irrational behaviors, including hearing voices, experiencing hallucinations, and having flashbacks." *See id.* at 14–15. By contrast, McLaughlin provided clear and specific testimony. And while McLaughlin did not have independent memory of giving the preamble and did not note it on the report, he testified that he always gave such a notice in like interviews, and without 302 recordation. *See id.* at 16. That was enough, in Judge Ingram's view, to find by a preponderance of the evidence that McLaughlin notified Elfgeeh that the interview was voluntary and that Elfgeeh could refuse to answer and stop questioning at any point.

Judge Ingram then considered the *Howes* factors, ultimately finding that they called for a non-custodial finding for the FBI interview. *See id.* at 17–20. He found that the presence of multiple officers in the room weighed in favor of custody, and that Elfgeeh's restraints weighed slightly in favor of custody, this given that SHU inmates were always cuffed behind their back outside their cells. *See id.* at 17–18. However, the short duration of the interrogation and that Elfgeeh would and did return to his SHU cell—Elfgeeh's status quo at the time—at the interview's end weighed against custody. *See id.* Finally, McLaughlin's preamble testimony critically tipped the balance away from custody. *See id.*

Judge Ingram also squared Elfgeeh's circumstances with the Court's recent order granting suppression in a similar interview for USP McCreary Defendant Kenneth King. *See* DE 161 at 17–20. He found that relevant differences separated King's and Elfgeeh's interviews, tipping the present balance against a custodial finding. *See id.* at 18–20. As a few, Elfgeeh was already housed in the SHU prior to the interview, contrasted with King's case, where the interview served as a segue to SHU placement. *See id.* at 19. Similarly, King received no assurances that the interview was voluntary and could be terminated at his wish, in contrast with McLaughlin's preamble. *See id.* at 17–18.

7

Elfgeeh timely objected to Judge Ingram's recommendation. *See* DE 167. He argues again that the *Howes* factors establish *Miranda* custody as to both interviews and that *King* was closer to this case than Judge Ingram perceived. *See id.* With the benefit of extensive briefing, hearing proof, and Judge Ingram's recommendation, the Court turns to the merits.

## II.     Legal Standard

When a party properly objects to a magistrate judge's dispositive recommendation, the Court reviews those portions de novo. *See* 28 U.S.C. § 636(b)(1)(C) (requiring "a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made"); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation."). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." § 636(b)(1)(C). However, the Court need not conduct "review of a magistrate[] [judge's] factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 106 S. Ct. 466, 472 (1985). The Court tailors its analysis accordingly.

The Fifth Amendment's Self-Incrimination Clause guarantees an individual the right not to "be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect this right, law enforcement must provide an individual subject to custodial interrogation with certain requisite warnings concerning the right to remain silent and to legal representation. *See Miranda v. Arizona*, 86 S. Ct. 1602, 1630 (1966). Absent sufficient warnings, statements obtained during custodial interrogation are inadmissible at trial as part of the Government's case-in-chief. *See id.* Elfgeeh bears the burden of showing that he was subject to custodial interrogation. *See United States v. King*, 760 F. Supp. 3d 510, 515 (E.D. Ky. 2024).

The dispositive question, here, is whether Elfgeeh was in "custody" for purposes of *Miranda* for either interrogation.

"'[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes*, 132 S. Ct. at 1189. An individual is in custody if a "reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *See id.* (citation, quotation marks, and brackets omitted). The inquiry is objective and turns on examination of the totality of the circumstances. *See id.* But "[e]ven if a reasonable person in a suspect's position would not have felt free to leave, the suspect is not in custody unless 'the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'" *United States v. Howard*, 815 F. App'x 69, 79 (6th Cir. 2020) (quoting *Howes*, 132 S. Ct. at 1189–90).

A prisoner is not automatically in custody when removed from the general population for interrogation. This was the essence of *Howes*. *See Howes*, 132 S. Ct. at 1187–90 ("[I]mprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*."). Three reasons, special to incarceration, justify rejection of a categorical rules and adoption of a nuanced approach: 1) "[Q]uestioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest;" 2) "[A] prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release;" and 3) "[A] prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence." *Id.* at 1190–91. Thus, in the peculiar realm of prison questioning, courts must consider five non-exhaustive factors to determine if a reasonable person would have felt free to terminate the interrogation and return to his cell, in light of the ordinary restraints, procedures,

9

and environment expected in a prison: 1) the location of the questioning, 2) its duration, 3) statements (*e.g.*, assuring the right to end the interview and leave) made during the interview, 4) the presence or absence of physical restraints during the questioning, and 5) the release, or not, of the interviewee at the end of the questioning. *See id.* at 1189; *see also Simpson v. Warden, Warren Corr. Inst.*, 651 F. App'x 344, 355 (6th Cir. 2016) (habeas case applying factors from *Howes* in similar prison context). Courts should also examine "the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted." *See Howes*, 132 S. Ct. at 1192. No single factor is determinative, *see United States v. Martinez*, 795 F. App'x 367, 371 (6th Cir. 2019), but whether the subject was advised that questioning was voluntary and optional is "the most important" in the analysis. *See United States v. Holt*, 751 F. App'x 820, 824 (6th Cir. 2018) (referencing the prosecutor telling the subject he did not have to answer questions and citing *United States v. Swanson*, 341 F.3d 524, 530 (6th Cir. 2003)).

### III. Analysis

The Court turns to the merits, taking each disputed interview in turn. Judge Ingram properly weighed the *Howes* factors in finding that Elfgeeh was not in "custody" during either interview. Because the Court agrees, on de novo consideration, it adopts Judge Ingram's report and recommendation for the following reasons.

#### a. January 23, 2019, Cell Interview

The *Howes* factors conclusively show that Elfgeeh's January 23, 2019, cell interview was not custodial for purposes of *Miranda*. As Elfgeeh himself acknowledged, those types of interviews were voluntary and routine, so a reasonable person with that ready perception would have felt at liberty to decline the brief questioning. And the other *Howes* factors uniformly weigh against custody.

The first factor, the interview location, points against a custodial finding. The investigation took place in Elfgeeh's SHU cell—effectively his normal residence during his lengthy stint in the unit. *See* DE 146 at 18; 28 (Elfgeeh testifying he spent 13 months in the SHU from 2018–19). This preserved Elfgeeh's status quo at the time and created a physical barrier between interviewer and subject, lessening coercive pressures. Duncan also remained outside the cell, respecting what space Elfgeeh had, and detracting from any notion of a custodial setting in the process.

The duration of the interview and Elfgeeh's freedom of movement in the cell also cut against custody. Elfgeeh estimated that Duncan interviewed him for a minute or less, *see id.* at 30, only time enough for a few questions at most. And remaining in his cell without handcuffs or other restraints, Elfgeeh maintained his usual freedom of movement within his SHU cell. The quick interview limits the coercive potential, and Elfgeeh's freedom of movement on his own turf—limited as it necessarily and normally was—suggests something short of custody.

Elfgeeh stayed put in his cell after the interview ended, facing no disruptive or status altering movements as a feature of the interaction. That Elfgeeh was where he always would have been eliminates the potential that he was lured into speaking by any prospect of release, weighing against custody.

Finally, and most importantly, Elfgeeh's clear understanding of the voluntary nature of the interview forecloses a custodial finding. Elfgeeh perceived cell interviews of the type to be voluntary, an aspect of typical (indeed "weekly") rounds that would include SIS. *See id.* at 31. He testified that an inmate in this circumstance could refuse to speak to SIS at his cell for "whatever reason." DE 146 at 44. He depicted such rounds as normal and not hostile, but instead that the officers would "be at your door . . . like anybody checking on you or to talk if he wants." *Id.* at 31. He later unconditionally reaffirmed: "When SIS [comes to] ask you questions at the door, you can

11

refuse to talk to them." *Id.* at 46. If the inmate categorically knows he has no obligation to talk, in the context of this SHU interaction, he could not reasonably view the circumstances as equivalent to arrest and thus custodial. Elfgeeh knew these interviews to be routine and voluntary. He could speak with Duncan or refuse to answer altogether with no suggestion of repercussion. The interaction was not *Miranda* custody.

Judge Ingram had "no difficulty" finding that Elfgeeh was not in custody during the January 23, 2019, cell interview, *see* DE 161 at 9, and neither does the Court. The *Howes* factors and motivating principles counsel against custody; suppression is not an available remedy.

### b. February 1, 2019, FBI Interview

The Court turns next to the February 1, 2019, FBI interview, which is a closer call. Marshalling the *Howes* factors again yields a conclusion of non-custodial interrogation here too, if more narrowly.

Start with the location of the questioning. This factor favors a custodial finding. Officers transported Elfgeeh to the lieutenant's office, a small "closet-type" office in the SHU. *See* DE 146 at 58. As the Court has previously emphasized, the lieutenant's office is "the office of someone in a position of authority." *King*, 760 F. Supp. 3d at 517. And while the SHU lieutenant did not ultimately join the interview, Elfgeeh understood, with particular regard to SIS, that the group investigated inmate misconduct and could refer matters to Disciplinary Hearing Officers (DHO) for potential sanctions. *See* DE 146 at 27–28. Further, the FBI by definition investigates crime, and that Agency's involvement was a novel ingredient. These are clear markers of a custodial setting: a secluded room, separate from one's cell and facing questioning from persons in authority, including federal law enforcement. Judge Ingram found that this factor indicates custody, *see* DE 161 at 17, and the Court does too.

From there, though, the factors are a mixed bag for Elfgeeh, mostly cutting against custody. The duration of the interview attenuates custody. Elfgeeh remembered the interview lasting a mere five minutes or less, and McLaughlin estimated it at ten. Even crediting Elfgeeh the extra five minutes, that's not durationally suggestive of custody, especially considering far longer interviews determined not to establish *Miranda* custody. *See Howes*, 132 S. Ct. at 1193 (finding no *Miranda* custody where inmate was questioned for five to seven hours). The length depicts a quick discussion, not a laborious and attritting investigation into Elfgeeh's doings.

Elfgeeh's release (meaning, SHU return) at the end of questioning also signals against custody. For an inmate, the only release prospect after an interview is further custody. That's why this Court has looked to whether prison staff returned the inmate to their "status quo" after the interview. *See King*, 760 F. Supp. 3d at 519. At this point, Elfgeeh had been housed in the SHU for months and there was no prospect, irrespective of interview result, of his return to the general population. *See* DE 146 at 39 (noting that he was returned to his SHU cell the same way after the interview). Elfgeeh's return to the SHU was inevitable, regardless of what he said or didn't say in the interview. And while that may be cold comfort for an inmate serving a long stint in isolation, it confirms that the "specter of the SHU" was not a carrot or stick used to facilitate interview participation. *See King*, 760 F. Supp. 3d at 519. This cuts against custody.

The same is true of Elfgeeh's restraints. There's no doubt he was restrained—both spatially in the prison and physically with rear restraints. But this too is a normal aspect of life for SHU denizens. Elfgeeh testified that during his time in the SHU, he remained shackled, always behind his back, for any out of cell activity, with the lone exception being recreation time, when SHU inmates were secured in a different cage in the recreation yard. *See id.* at 41, 45, 49. The shock of restraint that normally accompanies an arrest loses its spark when restraint is a generally applicable

13

feature of life in confinement. Elfgeeh wasn't restrained because he was being interviewed; guards restrained Elfgeeh because he was a SHU inmate removed from his cell. *See United States v. Mines*, No. 4:18-CR-552, 2018 WL 6190491, at *2 (N.D. Ohio Nov. 28, 2018) (finding that SHU inmate was not in custody during FBI interview, despite restraints, because inmate was routinely restrained at the prison). SHU SOP, even though invoked here incident to the interview, is not the type of change or environmental factor that would establish custody. *See Howes*, 132 S. Ct. at 1192 ("Escorts and special security precautions may be standard procedures regardless of the purpose for which an inmate is removed from his regular routine and taken to a special location.").

Finally, and most importantly, the Court considers statements made during the interview, focusing on whether the Agent advised Elfgeeh that the interaction was voluntary and that he could refuse to answer questions. This factor's impact largely turns on credibility. If Elfgeeh is to be believed, then it weighs in favor of custody; if McLaughlin is to be believed, then it weighs against it.

Judge Ingram sided with McLaughlin, and so does the Court. Judge Ingram's justifications for crediting McLaughlin's testimony were well grounded. McLaughlin answered clearly and consistently as to whether he explained that the interview was voluntary. He testified that every time (of the many) he conducted a SHU interview of this type, he informed the subject through a "preamble" that the interview was voluntary and that the inmate could refuse questioning. *See* DE 146 at 51. And while there was no specific event recollection, either through personal knowledge or documentation, that he administered that same preamble on this occasion, he testified that it was his standard and unvaried practice, in his frequent (between 10 and 50) SHU interviews, to offer the preamble before beginning questioning. *See id.* at 61–62. McLaughlin also had little reason to fabricate testimony. His stake in the outcome of the motion is tangential at most.

14

Contrast that with Elfgeeh's testimony, which offered good reasons for disbelief. Elfgeeh's testimony was not a model of consistency. *See, e.g.*, DE 146 at 30, 44, 46 (first stating that he could not refuse to answer questions during the cell interview, then later testifying that he could refuse). And his answers were at times jumbled and unclear, where he would begin to answer the question just to then wander onto a different train of thought. *See, e.g., id.* at 31 (struggling to answer what the subject of the cell interview was), 43 (struggling to remain on track with questions regarding concentration), 22–23 (non sequitur on voluntariness on hearing day). Further still, Elfgeeh's mental health challenges are well documented on this record. *See, e.g.*, DE 64, 67. And as it relates to this matter, he readily admitted that the voices he hears adversely affect his ability to concentrate on his surroundings, especially in isolation, casting further doubt on his capacity to accurately recall the specific details of this interview, one of many that occurred in the same office, now six years removed. *See* DE 146 at 33, 43. Further, Elfgeeh had much to gain in stating that McLaughlin failed to explain that the interview was voluntary.[3]

Elfgeeh, in addition to his diametric pivot on any obligation to answer questions in the earlier interview, demonstrated instability as a narrator. He readily conceded not only a history of hallucinations but presence of that problem on the very day of the hearing. *See id.* at 14 (noting that he is "usually hearing voices and stuff"). Given the finding on the room population (counter to Elfgeeh), the pervasive claims of external influences, and McLaughlin's unvarnished recounting, the Court accepts the Agent's version, just as Judge Ingram did. That testimony establishes that the Agent definitively told Elfgeeh that the interview was voluntary, that Elfgeeh

---

[3] Elfgeeh faults Judge Ingram for making "selective credibility determinations" regarding his testimony, crediting it for purposes of the cell interview but not the FBI interview. *See* DE 167 at 5–6. It's natural that Judge Ingram credited Elfgeeh's testimony about the cell interview, because his was the only testimony about that interview. In stark contrast, Judge Ingram confronted directly contradictory testimony concerning aspects of the FBI interview, prompting the need for a credibility determination. What Elfgeeh pitches as selective credibility was instead the natural result of sorting proof in a hearing.

had no obligation to answer questions, and that he could stop the interview at any time. *See* DE 146 at 51–52, 61–63. This "most important factor" clinches the non-custodial finding. *See Holt*, 751 F. App'x at 824.[4]

As to this element, Elfgeeh argues that, even assuming McLaughlin explained that the interview was voluntary, he subjectively believed he was required to engage, in fear of retaliation. *See* DE 167 at 5. Crucially, the question is whether a reasonable person in Elfgeeh's shoes would've felt free to end the interview, not whether he personally did. *See Howes*, 132 S. Ct. at 1189. Still, he argues that the answer is no, given that guards could "terrorize" him by withholding privileges like showering and playing with his food. *See* DE 146 at 47–48. Elfgeeh's testimony on these issues was general and non-specific. He didn't indicate that prison staff threatened those tactics or that he had any precise reason to believe that officers would employ them if he refused to answer questions from McLaughlin, an Agent of a distinct entity. *See id.* (Elfgeeh testifying that terrorizing happened "all the time" but failing to offer specific instances or relation to the interview). Such things may have happened to Elfgeeh in the past, but nothing in his testimony suggests they were likely to happen again in response to the interview. General and subjective experiences, removed from the events at issue, do not meaningfully affect the reasonable person analysis.

---

[4] Elfgeeh attempts to divide this into sub-elements, suggesting McLaughlin did not tell him he was free to leave at any point. *Howes* characterized the notice aspect in different ways, but the Court placed special emphasis on knowledge that the subject "was told that he was free to end the questioning and to return to his cell." *Howes*, 132 S. Ct. at 1193. In *Howes*, the defendant was not told he "was free to decline to speak" to his interrogators. *Id.* Here, the Agent did tell Elfgeeh he had no obligation to speak *and* that Elfgeeh could end the questioning at any point. Of course, being a long-time SHU placement, Elfgeeh could not "roam free" of his own volition. *See id.* However, immediately upon conclusion of the interview, authorities did return him to the SHU. Every situation in this area is fact specific, but the Court takes the notice given as effectively confirming to Elfgeeh that whether the interview occurred and when it ended fell under Elfgeeh's sole agency and control, a strong indicator of the non-custodial nature. The length of the interaction and prompt SHU return bolster that Elfgeeh faced nothing that would equate to station-house interrogation.

16

The tenor of the interview also suggests something short of custody. In addition to the five enumerated factors, *Howes* directs courts to consider "the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted." *Howes*, 132 S. Ct. at 1192. First, McLaughlin testified that Elfgeeh was "eager" and willing to talk about the assault and participate in the interview, leaving law enforcement with the impression, both before and during questioning, that Elfgeeh wanted to tell his side of the story. *See* DE 146 at 51–52 (McLaughlin testifying that Elfgeeh never indicated that he did not wish to continue answering questions). That the interview appears to have been measured and cordial on both sides, with all remaining seated, voices kept at normal levels, and no name calling or coarse talk, also suggests that Elfgeeh objectively took—and gave off—the impression that the exchange was voluntary. *See id.* at 52–53; *cf. King*, 760 F. Supp. 3d at 518 (finding custody where subject became "agitated" and repeatedly stated "no comment" to repeated questions). There's also no suggestion that McLaughlin threatened Elfgeeh with prosecution or punishment, asking him simply what gave rise to the incident and allowing Elfgeeh to respond with a narrative. The Agent recalled asking very few questions. *See* DE 146 at 52; *see also Holland v. Rivard*, 800 F.3d 224, 238 (6th Cir. 2015) ("[T]he absence of threats or suggestions of arrest are factors that weigh against finding *Miranda* custody."). McLaughlin did not, e.g., confront Elfgeeh with proof or use rough, aggressive talk to spur answers.

Elfgeeh draws purported parallels to this Court's holding in *King*. There are, to be sure, some similarities: King was interviewed in the lieutenant's office, was restrained behind his back, and received no *Miranda* warnings. *See King*, 760 F. Supp. 3d at 517–19. But there are also plenty of differences—differences that touch on the most influential factors in the *Howes* analysis. First, King and Elfgeeh were both restrained behind their backs during the interview. Importantly,

17

though, King, as an inmate in the general population prior to the interview, was moved and restrained for the purpose of engaging in the interview prior to SHU transport, not as part of routine practice, like Elfgeeh. *See King*, 760 F. Supp. 3d at 519. Similarly, King's release prospects clearly indicated custody. As noted, prison staff transferred King to the SHU from the general population following the interview. *See id.* This contrasts with Elfgeeh, who was already housed in the SHU and would have returned to the SHU regardless of how the interview concluded.[5] An adverse housing placement *following* an interview certainly lends itself more to custody than an interview with no effect on placement status. Finally, and most critically, there was no suggestion that interviewers explained to King the voluntary nature of the interview or his power to end the encounter. *See id.* at 520. And the circumstances of the interview indicated something quite the opposite, with King answering, "no comment" and becoming agitated on several occasions before officers ultimately ceased questioning. *See id.* That, again, contrasts with Elfgeeh. The Agent expressly alerted Elfgeeh to the voluntary nature and Elfgeeh's power to stop the interview. Elfgeeh continued the conversation without balking.

Elfgeeh finally argues that *Howes*'s three policy justifications (discussed at 132 S. Ct. 1190–92) against adopting a categorical rule for custodial interrogation in the prison context don't apply to this interview. *See* DE 167 at 12–14. The Court disagrees. Elfgeeh had already had a shot hearing and the prior interview over the incident, and indeed he said he'd been questioned "more than once," DE 146 at 33, about the same altercation. He faced a long and unrelated extant sentence, and though this matter reflected new trouble, Elfgeeh would not have viewed submission to questioning as a lure toward "prompt release." Further, the Agent did not represent a person

---

[5] King was in the general population, and his interview occurred during the lockdown immediately following the suspected murder. Thus, taking King from his cell, restraining him throughout the interaction, and then depositing him in the SHU were all dramatic changes from what King normally experienced and pointed toward custody.

with reasonable power to effect, as relevant to his objective mindset in the moment, existing custodial duration or instant custodial placement.[6] Finally, an inmate steeped in SHU formalities would not have experienced shock at restraints or significant and pervasive limits on movement; such is life in that jail within the jail, what *Howes* called "ordinary prison procedures." This case, as most, calls for a granular and nuanced assessment of all of the circumstances. That full assessment results in the finding that neither interaction at issue amounted to custody. In each, Elfgeeh knew he could simply elect not to talk, producing a status quo circumstantial result. The case does not bear the worrisome and coercive hallmarks that signify the line between a custodial and noncustodial interaction.

IV.  Conclusion

Elfgeeh was not in *Miranda* custody for either adjudicated interview. Judge Ingram correctly applied the *Howes* factors, and the Court reaches the same conclusion de novo. The Court **DENIES** Elfgeeh's suppression motion, DE 92, **ADOPTS** Judge Ingram's Report and Recommendation, DE 161, and **OVERRULES** Elfgeeh's objections, DE 167.

This the 3rd day of July, 2025.

Signed By:
*Robert E. Wier* /REW/
**United States District Judge**

---

[6] Again, the shot hearing was in the past, and McLaughlin is not part of the BOP structure. If merely talking to law enforcement about a possible crime in prison countered this policy justification, the Supreme Court would not have listed it in the first place. The point is that the interview, and submission to it, did not in any way rationally stand between Elfgeeh and expected freedom, cutting against the typical custody dynamic.