UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:23-CR-19-REW-HAI |
| | ) | |
| v. | ) | |
| | ) | OPINION & ORDER |
| MUFID ELFGEEH, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Nearly eighteen months before a grand jury indicted Defendant Mufid Elfgeeh on a single charge of attempted murder, USP McCreary officials destroyed the shank used in the alleged attempt. McCreary held on to the shank for over two years following Elfgeeh's internal discipline and the FBI's formal declination to investigate the case. Elfgeeh, now armed with an expert report opining that the shank's construction signals non-lethal intent, moves to dismiss the indictment for purported spoliation in violation of his due process rights. *See* DE 180. The Government responded in opposition, *see* DE 182, and Elfgeeh replied, *see* DE 185. No party requested a hearing. Here, Elfgeeh fails to establish the elements of a due process violation, so the Court **DENIES** the motion.

I.  **Background**

The facts underlying the motion are straightforward. On January 15, 2019, Elfgeeh, while confined in the SHU at USP McCreary, allegedly attempted to kill his cellmate. *See* DE 1. As part of the incident, Elfgeeh purportedly used a homemade shank to repeatedly stab the victim in the head, neck, and shoulders. The shank, preserved now only by photo, is an 8-inch piece of metal, sharpened to something of a point, and wrapped in cardboard and white sheet to create a handle. *See* DE 182-1; 182-3; *see also* DE 191-1 (Baird Report) at ¶ 15.

1

McCreary officials took possession of the weapon just after the assault and cataloged it in the prison's electronic inventory system. *See* DE 182-1. They then referred the matter to the FBI for investigation on January 16, 2019. But just a day later, the FBI declined to investigate the matter. *See* DE 182-2. McCreary officials did not log the shank as evidence. *See* DE 182-1 ("evidence" checkbox left blank in electronic inventory system).

Over two years passed before McCreary officials destroyed the weapon on June 30, 2021. *See* DE 182-1. At the time of destruction, Elfgeeh faced no criminal charges for the altercation and had only received discipline through an internal DHO/shot hearing. BOP policy, which purportedly allows for destruction of non-evidentiary items after a year, *see* DE 182 at 3, supported the destruction. *See id.*

The record does not explain why the prosecution arose, after the initial FBI declination, but another two years passed before a federal grand jury indicted Elfgeeh on the charge of attempted murder arising out of the altercation. *See* DE 1. As part of the defense's preparation for the case, Elfgeeh retained retired BOP Warden Maureen Baird to prepare a report on the shank. *See* DE 180 at 1–2; DE 191-1. Baird, as part of her report and after reviewing the shank by photo, opined that, due to its "dull point on the tip[,]" the shank was, "although dangerous," not what she "would have considered of lethal quality" during her BOP tenure. *See id.* at 2. That "[t]he edge of the shank had not been shaved down or fashioned into a sharp point" categorized the weapon, in Baird's view, as a "blunt weapon with no penetrating point or edge." *Id.*[1]

Elfgeeh's counsel and investigation team attempted to view the actual shank in person at USP McCreary in February 2025 but were informed that the weapon had been destroyed. *See* DE

---

[1] The Court ordered Elfgeeh to tender the full report for purposes of resolving this motion. *See* DE 187. Elfgeeh complied, and the Court reviewed the report in full. Elfgeeh represented that the report was previously tendered to the Government.

2

180 at 2. Though, McCreary apparently had maintained some other items relevant to the prosecution, including articles of clothing, which the defense successfully reviewed. *See* DE 185 at 1.

The discovery of the destruction prompted this motion, alleging spoliation in violation of Elfgeeh's due process rights. He generally argues that the BOP, acting in bad faith, selectively destroyed the shank, which presented significant and apparent exculpatory value to Elfgeeh. He thus moves for the Court to dismiss the indictment or impose evidentiary sanctions on the Government during trial to prevent any advantage from the "intentional destruction of the shank." *See* DE 185 at 5. The matter is now ripe for review.

## II.     Standard

The Due Process Clause protects a criminal defendant in "what might loosely be called the area of constitutionally guaranteed access to evidence." *California v. Trombetta*, 104 S. Ct. 2528, 2532 (1984). That right protects a defendant from the government's destruction of exculpatory evidence in two circumstances. The first involves the government's destruction of "material exculpatory evidence"—that is, evidence that "might be expected to play a significant role in the suspect's defense." *See id.* at 2534. As to that category of evidence, a due process violation arises where the destroyed evidence was "material," meaning it had "an exculpatory value that was apparent before the evidence was destroyed" and was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* Destruction of evidence falling into this category "violates a defendant's due process rights, irrespective of the good or bad faith of the prosecution." *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996).

Aside from material exculpatory evidence, the government may also violate a defendant's due process rights by destroying "potentially useful" evidence. *Arizona v. Youngblood*, 109 S. Ct.

3

333, 337 (1988). That category includes "evidence whose exculpatory value is indeterminate," *Jobson*, 102 F.3d at 218, and "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 109 S. Ct. at 338. The Due Process Clause requires a "different result" when analyzing this category of evidence as compared to material exculpatory evidence. *See id.* at 333; *see also United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001) ("Separate tests are applied to determine whether the government's failure to preserve evidence rises to the level of a due process violation in cases where material exculpatory evidence is not accessible, versus cases where 'potentially useful' evidence is not accessible.") (internal citations omitted).

As to this category of evidence, government bad faith is a sine qua non, a requirement, to establish a due process violation. *See Youngblood*, 109 S. Ct. at 338 ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."). Bad faith requires a particular showing in this setting. The government's negligence—even gross negligence—will not do. *See Jobson*, 102 F.3d at 218. Rather, the defendant must demonstrate "official animus" or a "conscious effort to suppress exculpatory evidence." *Trombetta,* 104 S. Ct. at 2533.

Noting an "inter-relat[ion]" between bad faith and apparent exculpatory value, the Sixth Circuit has established three requirements for finding a due process violation for destruction of potentially useful evidence: "(1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain

4

comparable evidence by other reasonably available means." *Jobson*, 102 F.3d at 218.[2] A defendant's failure to substantiate bad faith is fatal to a *Youngblood* challenge. *See Wright*, 260 F.3d at 571.

III.   Analysis

Beginning with *Trombetta*, Elfgeeh must show that the shank was materially exculpatory and, as part of materiality, that he could not obtain comparable evidence through alternative means.

The shank was not materially exculpatory at the time of destruction. The photo of the shank clearly depicts a weapon. *See* DE 182-3. The piece of metal, nearly 8 inches long, is honed to something of a point on one end and paired with a makeshift grip on the other. *See id.* It's readily apparent that the shank could inflict certain damage to a human body if used forcibly. McCreary staff classified the weapon as "Sharpened Metal" and described it as "sharpened to a point on one end[.]" *See* DE 182-1. Regardless of the relative sharpness of the grinded point as a matter of lethality, the shank's plain characteristics as a weapon are inculpatory, and in any event, quite the

---

[2] The Court briefly pauses to discuss the rather circular nature of this three-part test, compared to *Trombetta*. If a *Youngblood* violation, as instructed by the Sixth Circuit, turns on bad faith and apparent exculpatory value, then the latter, added requirement largely collapses the two standards. Thus, if *Youngblood* requires apparent exculpatory value, then how would any *Youngblood* situation not also satisfy *Trombetta* (which requires no bad faith showing related to destruction of material exculpatory evidence)? At least one judge in the Circuit has noted the tension. *See Wright*, 260 F.3d at 573 ("The problem with *Jobson* is that it conflates the differing tests of *Trombetta* and *Youngblood* such that there is no longer any distinction between materially exculpatory and potentially exculpatory evidence.") (Gilman, J., concurring). Undoubtedly, *Youngblood* itself says that bad faith "must necessarily turn on the police's knowledge of the exculpatory evidence at the time it was lost or destroyed." *Youngblood*, 109 S. Ct. at 336 n. *. The difficulty may resolve in the Court's inference of likely exculpatory worth from the knowing conduct of the destroying actor—that if the government intentionally acts to circumvent *Brady*, in a conscious effort to suppress access to defense proof, that action signals the likely valuable nature of the missing proof to the defense. The rule, as *Youngblood* described it, addresses "cases in which the police themselves *by their conduct* indicate that the evidence could form a basis for exonerating the defendant." *Id.* at 337 (emphasis added). Logically, knowledge of *potential* defense utility, rather than actual materiality, seems to characterize *Youngblood*'s territory when conscious or official animus exists. There must be a delta between *Trombetta* and *Youngblood*.

5

opposite of materially exculpatory. Even defense expert Baird calls the weapon, as fashioned, "dangerous." *See* DE 191-1 at ¶ 18.

BOP's knowledge of how Elfgeeh used the shank buttresses its plainly inculpatory characteristics. McCreary staff knew that Elfgeeh used the shank in an act of violence, one fully captured on video. The initial FBI referral classified the incident as an assault on an inmate, *see* DE 182-2 at 1, and BOP staff charged Elfgeeh with "assault with serious injury" for internal discipline. *See* DE 185 at 2. Moreover, the video of the assault, which depicts Elfgeeh stabbing the victim in the head, neck, and shoulders, featured in Elfgeeh's internal discipline and was part of the discovery presented to Elfgeeh by the Government in this case. Elfgeeh even reports that he told McCreary officials during post-assault interviews that he was "trying to kill" the victim. *See* DE 185 at 2; *see also* DE 92-1 (Elfgeeh reporting in post-assault interview that "the voices told him to kill" the victim). That McCreary well understood the shank as a weapon that could be—indeed, was—used in an act of violence with expressly fatal intent adds to its inculpatory characteristics and simultaneously distances it from *Trombetta* evidence.

Elfgeeh's exculpatory take largely relies on Baird's report concerning the weapon's lethality, paired with the elemental requirement that, as to the attempt charge, Elfgeeh have acted with the specific intent to commit murder. *Trombetta* requires that the exculpatory nature be apparent before evidence destruction, and neither of these were. *See Trombetta*, 104 S. Ct. at 2534. Elfgeeh first raised his exculpatory belief upon tender of Baird's report in late 2024, more than three years after the shank's destruction. Granted, nothing in *Trombetta* requires that a defendant express his exculpatory belief for a piece of evidence to qualify. But the esoteric exculpatory theory now advanced was hardly evident at the time of the assault or at the destruction decision. Rather, USP McCreary would have had only the plain characteristics of the weapon, coupled with

6

Elfgeeh's wielding the weapon in an act of violence, objectively captured, with an expressed intention to kill by Elfgeeh. *See* DE 92-1 at 1. These aspects are facially inculpatory. Second, whatever exculpatory value can be gleaned from the report depends on a granular parsing of the specific intent required by the attempted murder charge, which could not have been known to or fairly foreseen by McCreary officials at the time of destruction. The exculpatory value of evidence under *Trombetta* does not, here at least, turn on a nuanced and creative legal argument concerning a defendant's *mens rea*. Rather, *Trombetta* calls for *apparent* exculpatory value *before* the evidence is destroyed.[3] *See id.* Elfgeeh's theory is that—where an inmate viciously assaults a cellie with a sharpened piece of steel, later confirming his intent to kill—there should be evident exculpatory worth in the margin between a "dangerous" weapon and a "lethal" weapon. The delta is good fodder for trial, perhaps, but nothing would have made this degree of sorting apparent, as a matter likely central to the suspect's defense, when the BOP sent the shank to the refuse bin.

True, the indictment in this case came several years after destruction, making it impossible for Elfgeeh to substantiate his exculpatory belief prior. But this scenario is inapposite to the cases Elfgeeh cites, all of which feature a throughline consisting either of requests by the defendant to access evidence or the prosecution's independent knowledge of exculpatory value. *See United States v. Zaragoza-Moreira*, 780 F.3d 971, 979 (9th Cir. 2015) (exculpatory value of deleted video footage was readily apparent when defendant suggested, prior to deletion, that the video depicted

---

[3] Because the shank was not materially exculpatory at the time of destruction, the Court need not consider whether Elfgeeh could obtain comparable alternative evidence—*Trombetta*'s second requirement for finding a spoilation-based due process violation. However, if it were, Baird's expert report—based only on shank photos—provides evidence that Elfgeeh obtained comparable evidence through reasonably available means. Baird's report does not present the shank's destruction as a limiting factor in her analysis. Indeed, her report never asserts the need to see the object in order to render an opinion. Even when the defense sought a physical review, Baird's participation was suggested to be potentially by video. *See* DE 180, at 2. She reaches her conclusion that the shank was not of lethal quality without examining the shank physically or indicating that the absence of physical examination limited the report.

7

facts supporting a duress defense); *United States v. Bohl*, 25 F.3d 904, 906 (10th Cir. 1994) (finding due process violation where government destroyed exculpatory evidence "in the face of [defendants'] repeated request for pretrial access" to the evidence); *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993) ("The [destroyed] equipment's value as potentially exculpatory evidence was repeatedly suggested to government agents."). The value of these cases is accordingly limited.[4]

Finding no *Trombetta* violation, the Court considers whether *Youngblood* offers Elfgeeh a path to relief.

*Youngblood*'s bad faith hurdle is a high one, and Elfgeeh doesn't clear it.[5] Remember, bad faith carries specific meaning in this context. Negligence or even gross negligence on the Government's part in destroying the weapon won't do; Elfgeeh must show "official animus" or a "conscious effort to suppress exculpatory evidence." *Jobson*, 102 F.3d at 218.

First, the Court has already determined that the shank did not have facial exculpatory value prior to destruction. That closes the door on *Trombetta*, but at the same time, it also lessens the inferential link between exculpatory value and bad faith. *See Youngblood*, 109 S. Ct. at 336 n. * ("The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."); *Jobson*, 102 F.3d at 218 (noting that bad faith and apparent exculpatory value are "inter-related"). McCreary, by all accounts, had no reason to perceive the shank as

---

[4] These cases primarily turned on a *Youngblood* analysis. However, the rationales prove useful in the *Trombetta* context insofar as the government's independent knowledge of the defendant's exculpatory belief in those cases offered some level of exculpatory apparency. As noted, that feature is absent here.

[5] As an initial—but ultimately inconsequential—matter, the Court does find that the shank was potentially useful evidence to Elfgeeh. His defense produces an expert whose opinion inferentially undercuts specific intent by characterizing the absence of lethality in the weapon. This gives the weapon's properties potential exonerating power, within the *Youngblood* category of evidence.

exculpatory upon destruction. *See United States v. Hill*, 208 F.3d 210, at *1 (4th Cir. 2000) (table) (holding, as to destruction of shank involved in prison murder, "[defendant] failed to establish that such destruction was made in bad faith or that the shank's exculpatory value was apparent at the time of destruction").

The shank's destruction in the normal course further forecloses a bad faith finding. The Government explains that BOP policy allows for destruction of non-evidentiary items any time after a year of seizure. *See* DE 182 at 3 n.1. The assertion doesn't come with a citation, so the Court cannot be certain. But Elfgeeh does not offer anything to the contrary, and no one sought an evidentiary hearing. If the policy is accurate, McCreary held on to the shank more than a year after it was required to. *See* DE 182-1 (noting destruction on June 30, 2021). The United States proffers that the destruction was per policy and in advance of even the decision to initiate a prosecution. This cuts against bad faith and any suggestion of official animus. Rather than a calculated suppression, the timeline suggests that McCreary destroyed the shank "'in good faith and in accord with their normal practice.'" *See Trombetta*, 104 S. Ct. at 2533 (quoting *Killian v. United States*, 82 S. Ct. 302, 308 (1961)).

Elfgeeh resists this conclusion by arguing that McCreary's preservation of other evidence relating to the altercation, including clothing, evinces selective destruction, and thereby, potential bad faith. *See* DE 185 at 1. This doesn't get Elfgeeh very far. Surely there may be different and rational considerations in a federal prison between destroying an article of clothing and a dangerous weapon. The McCreary warden may not gain much in the way of safety by destroying an article of clothing involved in an inmate assault. But indefinitely maintaining homemade weapons in the prison leaves for the warden the irksome prospect of wrongful access. A swifter destruction of a weapon as compared to, say, an article of clothing, seems neither unreasonable

nor improbable in this context. And the bad faith inference that Elfgeeh urges is highly attenuated and unsupported on this record. There is an innocent government explanation as to the shank, and the defense offers nothing to differentiate or detail retention of the other materials, certainly nothing that sheds an incriminating light on BOP animus.

Elfgeeh further argues that because McCreary officials "charged" Elfgeeh with "assault with serious injury," DE 185 at 2, the prison at least should have preserved the shank as evidence for that investigation. The quick timeline for internal prison discipline presents challenges for Elfgeeh on this argument. The Court recognizes from other litigation in this case that Elfgeeh received a DHO/shot disciplinary hearing concerning the assault on January 22, 2019. *See* DE 188 at 2–3. For purposes of this argument, whatever evidentiary interest persisted for purposes of internal discipline was well over by the time of destruction, vitiating any reason to preserve the weapon as evidence for a potential criminal investigation some number of years down the road. Indeed, the cases clearly teach that the Due Process Clause does not impose on the Government "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 109 S. Ct. at 337. Elfgeeh fails to point persuasively to any "official animus" or "conscious effort to suppress exculpatory evidence" held by BOP officials in this matter. *See Jobson*, 102 F.3d at 218.

Lastly, a note on Elfgeeh's appeal to the "power of physical evidence." *See* DE 180 at 5. Presentation of the shank as physical evidence may be relatively more "powerful" than a photo, and surely primary evidence is better. But that question is not a central aspect of the *Trombetta*/*Youngblood* framework. Moreover, Elfgeeh's posture on physical observation of the shank indicates that the impact here may not be as great as his motion suggests. For one, as the Court previously noted, Baird's expert report—the main basis for alleged materiality—does not

10

depict photographic analysis (versus handling the actual weapon) as a limiting factor. Nowhere in the 11-page report does Baird express that observation of the photo alone inhibited her ability to effectively analyze the weapon or to reach her conclusion that the weapon was not designed for lethal use. To this, add defense counsel's suggestion that Baird "be allowed to participate in the examination either in person *or by video*." *See* DE 180 at 2. Physical observation clearly wasn't essential.

Without adjudicating the relative value of physical as compared to photographic evidence, it appears Elfgeeh largely has what he needs to mount a defense despite the destruction: a clear photo of the weapon and an expert report, prepared with reference to the photo, opining on the weapon's lethality. *This* cures an important part of the *Trombetta*/*Youngblood* concern. *See Trombetta*, 104 S. Ct. at 2534 (looking to whether the defendant could obtain "comparable evidence by other reasonably available means"); *Youngblood*, 109 S. Ct. at 337 (posturing the bad faith requirement as limiting the "police's obligation to preserve evidence to reasonable bounds and confin[ing] it to that class of cases where the interests of justice most clearly require it").

### IV.     Conclusion

For the stated reasons, neither *Trombetta* nor *Youngblood* calls for dismissal or sanctions. The Court **DENIES** DE 180.

This the 11th day of July, 2025.

Signed By:
*Robert E. Wier*  /REW/
United States District Judge